### 5907. SAVANNAH TRUST CO. *v.* NATIONAL BANK OF SAVANNAH.

1. The motion to dismiss the writ of error is without merit, since the act of the court in directing the verdict complained of was directly excepted to and was specifically assigned as error, in the bill of exceptions.
2. The plaintiff parted with the indicia of ownership to certain cotton, under an agreement that the cotton itself or its proceeds should be returned by an hour named on the following day. Its agents, who so received the cotton, thereafter conveyed the same to the defendant, in lieu of and in substitution for certain cotton previously received by them from the defendant. The defendant, bona fide and without knowledge that the agents were acting for another, accepted this cotton in lieu of the cotton it had previously parted with, thus surrendering all its rights and powers under a trust receipt for the cotton previously delivered by it to the same persons, and thereby parted with something of value and acquired good title to the cotton delivered to the defendant by way of substitution and pledge, as against the plaintiff.
3. Where an agency is concealed, a party dealing with the agent may set up any defense against the principal which he might have against the agent, and where one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury must bear the loss.

DECIDED SEPTEMBER 2, 1915.

Trover; from city court of Savannah—Judge Davis Freeman. June 24, 1914.

The Savannah Trust Company brought an action of trover

against the National Bank of Savannah for 501 bales of cotton. At the conclusion of the testimony the judge directed a verdict in favor of the defendant, and the case came to this court by direct exception to the verdict. The material evidence, as incorporated in the bill of exceptions, is here set out in full:

The "plaintiff introduced three promissory notes of Tinsley & Hull to plaintiff, aggregating $39,900. Following is a copy of one of them—No. 1:

"'$15,600.                      "'Savannah, Ga., Nov. 7, 1912.

Marks and        "''On demand we promise to pay to the order of
numbers          Savannah Trust Company at its place of business in
                 said city of Savannah, Ga., fifteen thousand six hun-
Various
195 B/C          dred 00/100 dollars, for value received, with interest
Sea Island       at the rate of ———— per cent. per annum ————
until paid.

"'To secure the prompt payment of this note, as well as the pay-
Sea Island       ment of any general or special balance due or to be-
cotton ac-       come due to the said Trust Company, we hereby
count            transfer, convey, and deliver, with full title thereto,
one hundred and ninety-five (195) merchantable bales of Sea Island cotton, the average grade of which is not below extra choice Savannah classification, and the average weight not less than 400 pounds per bale, stored in compresses warehouse, as per receipt herewith delivered, and valued at $————.

"'It is hereby agreed that other cotton of equal value, with receipts therefor, may be exchanged for the above, or any portion thereof, with the consent of the said Trust Company, which cotton so exchanged shall be bound and covered by this instrument as if the same had been originally transferred, conveyed, and delivered hereunder. And we represent and covenant that we have full power and authority to dispose of said cotton as aforesaid; that the same is not incumbered or affected in any way whatsoever by which the right and title of said Trust Company can be altered, defeated, or impaired; that we will not exchange or offer for exchange any cotton as aforesaid, over which we have not the same power and authority, and the title to which is not equally good and free from incumbrances.

"'The said Trust Company is fully authorized and empowered, through its officer or officers, agent or agents, to sell or otherwise

dispose of the whole or any portion of said cotton, either at public or private sale or sales, and with or without notice to us of such sale or sales, or of an intention to sell, either for the purpose of paying said note or any balance as aforesaid when due, or in case margin shall not be furnished by us when required, and at any such sale or sales the said Trust Company or any officer or agent thereof may be the purchaser, in whole or in part.

"'In case of deficiency we promise to pay to said Trust Company the amount thereof, forthwith after such sale, with interest at the rate as above named. This power and authority not to be altered or revoked by death, and this transfer, conveyance, and delivery of said cotton not to release us from payment of storage, fire insurance, and other expenses due or that may become due on said cotton.

"'The cotton above described, or which may hereafter be substituted therefor, is covered by insurance in Liverpool, policy No. 20055 issued to us on account of whom it may concern, to cover only cotton purchased by, for, or on account of ——, and all rights of said —— under said policy are hereby assigned and set over to said Savannah Trust Company, to protect its interests as it may appear.

"'In case of default we hereby agree to pay any attorney's fees and costs of court that may be incurred in securing the rights of said Trust Company, and collecting any amount or balance that may remain unpaid, which fees and costs shall be a part of our indebtedness hereby created, and be paid by said Trust Company from the proceeds of any such sale or sales.

"'Tinsley & Hull,
"'by P. H. All, Atty.

"'Signed in the presence of.——.'

"The other two notes are identical in form and verbiage, except as here noted: No 2 is a demand note of January 3, 1913, for $22,000, pledging 275 bales of Sea Island cotton, marks and numbers various; and No. 3 is a demand note of January 3, 1913, for $2,100, pledging 31 bales of staple cotton, marks and numbers various.

"Plaintiff introduced three trust receipts on forms printed on pink paper, generally known as 'pink tickets.' Following is a copy of one of them:

"'This ticket must be taken up by 1 o'clock p. m. to-morrow.

"'Amount of loan, $15,600.

"'Dated Nov. 7th, 1912.  "'Savannah, Ga., Mch. 4th, 1913.

"'Received from Savannah Trust Company, in trust, cotton receipts for one hundred ninety-five b/s Sea Island marked and num-

Marks and numbers

Various 195 b/s Sea Island

bered as per margin. The said cotton is now held by said bank, as collateral for a loan made by said bank to us for $15,600, and we have obtained said receipts from said bank for the purpose of having the property therein described delivered to...........
.................... Rehandle ................

"'Said property described in said receipts belongs to said bank, and is to be delivered by us (on sale or for shipment) as the agent of said bank, by 1 o'clock p. m. to-morrow, and the proceeds thereof are to be paid at once to said bank, or if said property is not disposed of as aforesaid and the proceeds paid to said bank within the time named, said receipts are to be returned to said bank within that time.

"'Tinsley & Hull.'

"The other two are of the same date and in all respects identical, except that No. 2 describes the amount of loan as $22,000 of January 3, 1913, and the amount of cotton as 275 bales of Sea Island cotton, marks and numbers various; and No. 3 describes the amount of loan as $2,100, of January 3, 1913, and the amount of cotton as 31 bales of staple cotton, marks and numbers various.

"Plaintiff also introduced the following power of attorney:

"'Office of Tinsley & Hull.

"'Savannah, Ga., Dec. 6th, 1907.

"'Mr. Jno. H. Strous, Treasurer—Dear Sir: Mr. P. H. All is authorized to transact all business in our name with Savannah Trust Company, and to draw, accept, and indorse in our name checks, notes, bills of exchange, and other commercial papers.

"'This authority is to continue until revoked by us in writing.

"'Tinsley & Hull.

"'Attorney: P. H. All.·

"'Witness: C. R. Hardee,

"'Notary Public, Chatham County, Ga.'

"Plaintiff also introduced sundry warehouse receipts issued in the name of Tinsley & Hull for the cotton of lots and marks de-

scribed in the petition as amended, aggregating 501 bales. One of these warehouse receipts is here copied:

"'Atlantic Compress Company.

"'Warehouse Cotton Receipt No. 10323.

"'Lower, Savannah, Ga.    .                                    12/10, 1912.

"'Received from Tinsley & Hull five (5) Sea Island bales of cotton.

"'This receipt is void unless the number of bales written herein correspond with the total indicated by the highest figure in the marginal column or columns.

"'As per marks below, to be delivered only upon the return of this receipt, properly indorsed, and the payment of such charges as may have accrued thereon under the current tariff of this company.

"'It is understood and agreed that there is no obligation on this company to carry insurance on said cotton, except where it is expressly required to do so under compression contracts with initial carriers; that such contractual obligation to insure covers only carrier's liability or interest, and in no event shall said liability begin until notice is given this company by the initial carrier of the issuance of its bill of lading in exchange for this receipt. Until such notice is received this company remains merely a bailee for hire, and the cotton under the control of the depositor.

| No. of bales. | Marks. | No. of bales. | Marks. |
| --- | --- | --- | --- |
| .................................................................... | | | |
| .................................................................... | | | |
| ...... 5 ........... ALTS .............................. | | | |
| .................................................................... | | | |

"'Storage commences ———.

"'R. P. Butler, Superintendent,

"'per J. P. Alcorn.'

"Indorsements on face: (1) A rubber stamp, 'Sea Island cotton.' (2) A rubber stamp, 'Canceled March 6, 1913. R. P. Butler, Superintendent, Lower Press.' (3) With pen, 'VWL 5.' Indorsement on back: 'Tinsley & Hull, by P. H. All, Atty.'

"The other receipts were issued by Atlantic Compress Company and by other warehousemen in Savannah. So far as their form is material to this case, they were substantially identical with the one copied above. Each of them shows on its face, either in the receipt

form ·itself or by stamps or writings on the face thereof, that the cotton represented thereby was (as to 470 bales) Sea Island cotton and (as to 31 bales) staple cotton. The words 'Sea Island' and 'Staple,' were either written in the main body of the receipt or written across the face of it, or there was stamped on the receipt by rubber stamp in red letters the words 'Sea Island cotton' or the words 'Sea Island cotton account.'

"Plaintiff introduced a receipt given by W. W. Gordon & Co., cotton factors in Savannah, to the National Bank of Savannah, dated March 5, 1913, acknowledging receipt of the warehouse receipts introduced in evidence. Gordon's receipt showed each warehouse receipt, its date, its number, the number of bales, the marks, whether it called for Sea Island, staple, or upland, and the warehouse from which it was issued. This receipt of Gordon & Co. also acknowledged receipt of warehouse receipts for 59 bales of upland cotton in addition to the 501 bales in dispute, being a total of 560 bales.

"Plaintiff introduced the following power of attorney:

"'Savannah, Ga., Oct. 18th, 1909.

"'Mr. P. H. All is hereby appointed our attorney in fact, and is authorized to transact all business in our name with the National Bank of Savannah, and to make,· draw, accept, discount, and indorse, in our name, checks, notes, bills· of exchange, bills of lading, receipts, and other commercial papers, to assign and transfer all mortgages, deeds, contracts, and choses in action, to give receipts and orders, and, generally, to sign all papers, and do all things necessary and proper, in transacting said business with said bank, just as fully as undersigned could do personally, hereby ratifying all things done by said attorney in fact in transacting said business.

"'This authority to continue until revoked by us in writing.

"'Witness our hand and seal.

"'Tinsley & Hull. [L. S.]
"'In presence of Cosmo R. Hardee,
"'Notary Public, Chatham County, Ga.'

· "J. H. Calais, for plaintiff, testified: 'I am and have been treasurer of plaintiff for several years. The three notes of Tinsley & Hull in evidence and aggregating $39,900 are wholly unpaid and there are no credits on them. Plaintiff has never received the 501 bales pledged under these notes and represented by these three

pink tickets, or any part of them, and has wholly lost them. When the warehouse receipts were surrendered to Tinsley & Hull on pink tickets on the morning of March 4, 1913, Tinsley & Hull were in good credit and there was no reason to suspect them. They are now insolvent. Their failure was announced and first became known to us on March 5, 1913. Prior to March 5, 1913, we had no reason to believe that Tinsley & Hull were in financial difficulty. The warehouse receipts introduced in evidence are the same which the plaintiff gave up on pink tickets of March 4, 1913. They represent the only Sea Island and staple cotton we ever had from Tinsley & Hull. All the marks on the receipts indicating whether the cotton was Sea Island or staple cotton were there when we surrendered them on March 4, 1913.'

"P. H. All, for plaintiff, testified: 'I was manager and cashier of Tinsley & Hull, and held their power of attorney with plaintiff and defendant for signing checks. The only Sea Island and staple cotton which Tinsley & Hull ever had was 510 bales, of which 9 bales were pledged with Savannah Bank & Trust Company, and the remaining 501 bales with plaintiff. The 501 bales in dispute were taken out of Savannah Trust Company on pink tickets signed by Mr. F. D. Tinsley, of Tinsley & Hull, on the morning of March 4th. On the same morning warehouse receipts for 560 bales of upland cotton were taken from the defendant on pink tickets signed by me as attorney for Tinsley & Hull. All of these receipts were carried to the office of Tinsley & Hull and put in the safe. The 501 bales received on pink tickets from the plaintiff were the ones originally pledged to plaintiff under its notes and held by it originally. On the afternoon of March 4th, by direction of Mr. F. D. Tinsley, I sent by messenger to the National Bank of Savannah the warehouse receipts for the 501 bales obtained that morning on pink tickets from the plaintiff and receipts for 59 bales of upland cotton in addition, making a total of 560 bales. It was my recollection that the pink tickets had been returned to us, but I see defendant has them now. We could get back the pink tickets if we wanted them; not wanting them, they would simply remain there. I sent the warehouse receipts in replacement and to take the place of the 560 bales of cotton which we owed them under these pink tickets. I sent 501 bales taken from the Trust Company and 59 bales of upland cotton in satisfaction of defendant's pink tickets.

They were in replacement of the 560 I got out in the morning. I sent them over at the direction of Mr. F. D. Tinsley. I sent other cotton. It was not the cotton I got out from defendant that morning. It was sent over for the purpose of taking up these pink tickets. I sent it in place of the cotton I got out. Staple cotton was carried in Sea Island cotton account. The marks on the face of the warehouse receipts, indicating "Sea Island," "Sea Island cotton," "Sea Island cotton account," or "Staple," as the case may be, were on the receipts when they were first pledged to the plaintiff.'

"G. A. Gordon, for plaintiff, testified: 'The firm of W. W. Gordon & Co., of which I was a member, sold for the defendant the 560 bales of cotton represented by the warehouse receipts received from the defendant on March 5, 1913. The description in the receipt we gave to the defendant as upland, Sea Island, or staple was only a description of what the receipts called for, as we had never seen the cotton. The 560 bales with marks as in our receipt turned out to be 430 bales of Sea Island, 64 bales of staple, and 60 bales of upland. We sold the staple and the upland for account of the National Bank, and on account of the unsatisfactory Sea Island market conditions at the time (which were very bad) we took over and paid for the 430 Sea Islands at an agreed price. The gross proceeds of all were $35,522.69. We afterwards sold the Sea Island cotton which we had taken over. I had rather not say whether we got more or less than we gave for it. Staple cotton is put up in upland bagging and looks just like it. It is classed with upland, and not with Sea Island. The market quotation on March 4, 1913, for middling upland cotton, was 12⅜. Upland weighs 500 pounds average, and Sea Islands run from 385 to 390 pounds. A bale of Sea Island, on the average, is worth about 20 per cent. more than a bale of upland, but Sea Island weights are very irregular. Sea Island cotton is different in appearance. There could be no mistake between Sea Island and staple and upland. Staple is in upland bagging and looks like upland.'

"Plaintiff also introduced certain papers and books, the material contents of which are, for the purposes of this bill of exceptions, sufficiently covered by the oral evidence.

"R. L. Withington, for defendant, testified: 'I have been cashier of defendant since January, 1913. On March 4, 1913, Tinsley & Hull were indebted to the defendant in the sum of $28,000, besides

interest, on two demand notes hereinafter described, secured by cotton collaterals, to wit, warehouse receipts for 560 bales of upland cotton. (The witness identified and proved the two notes dated October 24 and December 5, 1912, and the two pink tickets dated March 4, 1913.) The warehouse receipts we had showed that the warehousemen had received from Tinsley & Hull certain cottons described in the receipts, and the receipts were indorsed in blank by Tinsley & Hull. I surrendered the 560 bales of upland cotton on Tinsley & Hull's pink tickets on the morning of March 4, 1913. Tinsley & Hull, who had been doing business with us for years, would withdraw their cotton almost daily with these pink tickets in the morning, bringing in their warehouse receipts in the afternoon, and would take up these pink tickets, replacing the cotton they had taken out in the morning. They would bring receipts for the same number of bales. My instructions to Mr. Lorimer, discount clerk, were to see that the same number of bales were delivered back and that the indorsement was correct. On March 4, 1913, Tinsley & Hull were in good credit. Their failure was announced on the morning of the 5th, and that was the first intimation we had of it. When we found they were insolvent we disposed of the cotton through Gordon & Co. Tinsley & Hull would seldom take up their pink tickets when they surrendered the receipts; they would accumulate there. They would bring the receipts in and go right on out as soon as they were verified. Under our loans we feel we have the right to substitute, and we do substitute. They have a perfect right to bring back the same number of bales given out in the morning. If a man took out 500 bales of Sea Island, we would not let him bring back 500 bales of upland; but we would take Sea Island in the place of upland, because it is more valuable. Mr. Lorimer had authority to receive anything as of high grade or greater value.'

"Defendant introduced two promissory notes of Tinsley & Hull to defendant, aggregating $28,000. Following is a copy of one of them—No. 1:

"'$13,000.00　　　　　"'Savannah, Ga., Oct. 24, 1912.

"'On demand we promise to pay to the order of
Marks and
the National Bank of Savannah thirteen thousand
numbers
and no/100 dollars, for value received, with interest
Various
260 b/c
at the rate of 7 per cent. per annum, from date until
paid.

"'To secure the prompt payment of this note, as well as the payment of any general or special balance due or to become due, to the said corporation, we hereby transfer, convey, and deliver, with full title thereto, two hundred sixty b/c merchantable bales of upland cotton, the average grade of which is not below middling Savannah classification, and the average weight not less than ——— pounds per bale, stored in ——— warehouse, as per receipt herewith delivered, and valued at $———.

"'It is hereby agreed that other cotton of equal value, with receipts therefor, may be exchanged for the above or any portion thereof with the consent of the said corporation, which cotton so exchanged shall be bound and covered by this instrument as if the same had been originally transferred, conveyed, and delivered hereunder.

"'And we represent and covenant that we have full power and authority to dispose of said cotton as aforesaid, that the same is not incumbered or affected in any way whatsoever by which the right and title of said corporation can be altered, defeated, or impaired, that we will not exchange or offer for exchange any cotton as aforesaid, over which we have not the same power and authority and the title to which is not equally good and free from incumbrances.

"'The said corporation is fully authorized and empowered through its officer or officers, agent or agents, to sell or otherwise dispose of the whole or any portion of said cotton, either at public or private sale or sales, and with or without notice to us of such sale or sales, or of an intention to sell, either for the purpose of paying said note or any balance as aforesaid when due, or in case margin shall not be furnished by us when required, and at any such sale or sales the said corporation or any officer or agent thereof may be the purchaser in whole or in part.

"'In case of deficiency we promise to pay said bank the amount thereof forthwith after such sale, with interest at the same rate as above named.

"'This power and authority not to be altered or revoked by death, and this transfer, conveyance, and delivery of said cotton not to release us from payment of storage, fire insurance, and other expenses due or that may become due on said cotton.

"'In case of default we hereby agree to pay any attorney's fees

and costs of court that may be incurred in securing the right of said corporation and collecting any amount or balance that may remain unpaid, which fees and costs shall be a part of our indebtedness hereby created and be paid by said corporation from the proceeds of any such sale or sales.

"'Tinsley & Hull,<br>
"'by P. H. All, Atty.

"'Signed in presence of ———.'

"The other note (No. 2) is identical in form and verbiage except as here noted: It is a demand note of December 5, 1912, for $15,000, pledging 300 bales of upland cotton, marks and numbers various.

"Defendant introduced two trust receipts on forms printed on pink paper, generally known as 'pink tickets.' Following is a copy of one of them:·

"'To be redeemed by 6 p. m.· to-day.

"'Amount of loan, $13,000.00.

"'Dated October 24th, 1912.

"'Savannah, Ga., Mch. 4th, 1913.

Marks and numbers Various 260 b/c ,

"'Received from the National Bank of Savannah, in trust, receipts for two hundred sixty b/c marked and numbered as per margin. The said cotton is now held by said bank as collateral for a loan made by said bank to us for $13,000 and·any other indebtedness of the undersigned to said bank, and we have obtained said receipts from said bank for the purpose of having the property therein described delivered to——— Rehandle ———

"'Said property described in said receipts belongs to said bank, and is to be delivered by us (on sale or for shipment) as the agent of said bank, by 6 o'clock p. m. to-day, and the proceeds thereof are to be paid at once to said bank, or if said property is not disposed of as aforesaid and the proceeds paid to said bank within the time named, said receipts are to be returned to said bank within that time.

"'Tinsley & Hull,<br>
"'by P. H. All, Atty.

"The other pink ticket is of the same date and in all respects identical, except that No. 2 describes the amount of loan as $15,000

of December 5, 1912, and the amount of cotton as 300 b/c, marks and numbers various.

"A. A. Lorimer, for defendant, testified: 'On March 4, 1913, I was discount clerk with defendant, and it was my duty to verify the number of bales returned on pink tickets and to see that the receipts were properly indorsed. On March 4, 1913, when I found that Tinsley & Hull returned 560 bales of cotton and the warehouse receipts were indorsed by Tinsley & Hull in blank, I took them. I did not bother myself to see whether they were the identical cotton surrendered that morning on pink tickets or not. All I know was that 560 bales went out that morning and I received 560 bales back. Under their loans they have authority to substitute if they want to. They can exchange warehouse receipts if they want to.' "

In directing the jury to find a verdict for the defendant, the presiding judge said:

"I have come to the conclusion that, as a matter of law, there was a yielding up of the right under those pink tickets in exchange for the warehouse receipts representing the amount of cotton put into the National Bank on the evening of the 4th. It seems to me that it meets the law of the situation, and that no deductions from the facts would sustain a different conclusion, and I therefore find in favor of the motion" to direct a verdict in favor of the defendant.

*P. W. Meldrim, Lawton & Cunningham,* for plaintiff.

*Garrard & Gazan,* for defendant.

WADE, J. (After stating the foregoing facts.)

1. Error was assigned in the bill of exceptions as follows: "And now on July 18, 1914, within thirty (30) days from the adjournment of the Court and within thirty (30) days from the date of the verdict and of the direction given by the court and of the judgment entered thereon, comes the plaintiff and excepts to the said verdict and to the judgment and to the said direction of a verdict by the court in favor of the defendant, and assigns the same and each of them as error, and presents this its bill of exceptions and prays that the same may be signed and certified in accordance with law, that the errors herein alleged may be considered and corrected." The defendant in error moved to dismiss the bill of exceptions on the ground that there is contained therein no sufficient assignment of error to confer upon this court jurisdiction to entertain the appeal. There is no merit in this motion,

since it appears that there is a distinct assignment of error made upon the direction of the verdict complained of. In the case of *Cole* v. *Illinois Sewing Machine Co.*, 7 *Ga. App.* 338-339 (66 S. E. 979), this court held that it was not authorized to consider the question of the right of the trial judge to direct a verdict under the evidence on the general grounds of a motion for a new trial, and without any specific assignment of error as to the direction of the verdict; and the Supreme Court held in the case of *Dickenson* v. *Stults,* 120 *Ga.* 632 (48 S. E. 173), that it has no authority to decide whether the trial court erred in directing a verdict, "when there is no assignment of error made upon such direction." In the case of *Joiner* v. *Stovall,* 12 *Ga. App.* 19 (76 S. E. 753), it appears that the judgment was rendered by the court without the intervention of a jury, and the bill of exceptions set forth at length all the evidence and all the proceedings in the trial of the case, and concluded with the general statement that the judgment so rendered by the court was excepted to by the defendant, who "now assigns the same as error." This court said: "It nowhere appears in the bill of exceptions whether this general exception was one of law or fact," and hence it was held that the assignment of error presented no exception which this court could lawfully consider, and the motion to dismiss the writ of error was sustained on that ground. In the present case there was no conflict in the evidence whatever, and the only issue presented for determination by the court below was altogether one of law. Hence an assignment of error which complains of the direction of a verdict by the court in favor of the defendant, and further complains that such direction was error, presents for our consideration a question of law, which may be determined by an examination of the evidence which the trial court adjudged demanded a verdict in behalf of the defendant. See also *Patterson* v. *Beck,* 133 *Ga.* 701-707 (66 S. E. 911); *Andrews* v. *John Church Company,* 1 *Ga. App.* 560-561 (58 S. E. 130); *Mason* v. *Terrell,* 3 *Ga. App.* 348 (5), 355 (60 S. E. 4); *Penn & Watson* v. *McGhee,* 6 *Ga. App.* 631-633 (65 S. E. 686); *Fincher & Womble* v. *Hanson,* 12 *Ga. App.* 608-611 (77 S. E. 1068). See especially *Duggan* v. *Monk,* 5 *Ga. App.* 206 (62 S. E. 1017); *Meeks* v. *Meeks,* 5 *Ga. App.* 394 (63 S. E. 270); *Howell* v. *Pennington,* 118 *Ga.* 494 (45 S. E. 272); *Lyndon* v. *Georgia Railway & Electric Co.,* 129 *Ga.* 353 (58 S. E. 1047); *Patterson* v. *Beck,* supra.

2. On the morning of March 4, 1913, the Savannah Trust Company, the plaintiff, delivered to Tinsley & Hull certain cotton receipts for 470 bales of "sea island" cotton and 31 bales of "staple" cotton, pledged to that bank as security and so described in the notes, one of which is set out in full in the foregoing statement of facts. These cotton receipts were negotiable warehouse receipts in the usual form, issued to Tinsley & Hull by sundry Savannah warehousemen, and indorsed in blank by Tinsley & Hull. When the receipts were surrendered to Tinsley & Hull by the Savannah Trust Company, Tinsley & Hull gave therefor certain receipts, known in Savannah as "pink tickets," a copy of one of which appears in the statement of facts. On the same morning, Tinsley & Hull obtained from the National Bank of Savannah, the defendant, similar warehouse receipts, issued to Tinsley & Hull by various warehousemen in Savannah, covering 560 bales of "upland cotton," and gave to that bank two like "pink tickets" therefor. At that time Tinsley & Hull were in good credit, and, so far as either the bank or the general public was aware, there was no reason why their solvency should be questioned. On the afternoon of the same day, Tinsley & Hull sent by messenger to the National Bank of Savannah the warehouse receipts for the 501 bales of cotton obtained that morning on "pink tickets" from the Savannah Trust Company, and warehouse receipts for 59 bales of cotton in addition thereto, making a total of 560 bales in all, or the exact number of bales received by them that day from the National Bank of Savannah; and these receipts were accepted, without question, by one of the officers of the National Bank of Savannah in lieu of or by way of substitution for the 560 bales represented by the warehouse receipts delivered by it to Tinsley & Hull in the morning of the same day. This officer testified that since it was provided in the two promissory notes of Tinsley & Hull, payable to the National Bank of Savannah and aggregating $28,000, which were secured by a pledge of 560 bales of cotton to that bank, that other cotton of equal value, with receipts therefor, might be exchanged for the cotton pledged as security for the notes, or for any portion thereof with the consent of the payee, he accepted warehouse receipts for "sea island" cotton in lieu of "upland" cotton, the "sea island" cotton being not only of equal but of greater value than the "upland" cotton delivered in the morning. The evidence discloses

that at the time of this substitution the "pink tickets" which represented the 560 bales of "upland" cotton were neither called for by the messenger or agent of Tinsley & Hull, nor surrendered or delivered up by the National Bank of Savannah. Nevertheless, the evidence is clear that the 560 bales of cotton tendered by warehouse receipts that afternoon were accepted in substitution for those represented by the "pink tickets;" and by the acceptance of these 560 bales, including the 501 bales sued for, the defendant parted with a thing of value, to wit, all its rights under and by virtue of the trust receipts or "pink tickets," in cancellation of which the 560 bales were tendered and accepted.

The learned trial judge gave as his conclusion that, as a matter of law, there was, on the part of the National Bank of Savannah, a yielding up of the rights depending upon or growing out of the "pink tickets" or trust receipts, in exchange for the warehouse receipts for the 560 bales of cotton delivered to the National Bank of Savannah on the afternoon of March 4, 1913; and this court is of the opinion that his conclusion is correct. It is well settled that the pledgee of a collateral note is a holder for value, and if the creditor, at the time of receiving the collateral note, parts with anything of value, either money, property, or other securities, upon the faith of the note, he thereby becomes a holder for value; and in this case the surrender of collateral securities previously given, as indicated by the acceptance of other securities in the shape of warehouse receipts of like character, furnished a sufficient consideration to support the assignment or transfer of the warehouse receipts given in substitution.

There is no contention supported by any evidence in the record that the National Bank of Savannah had any knowledge whatever that 501 of the 560 bales of cotton delivered to it by Tinsley & Hull on the afternoon of March 4, 1913, was cotton which had been previously obtained on "pink tickets" or trust receipts by Tinsley & Hull from the Savannah Trust Company. The "pink tickets" set out that the warehouse receipts therein referred to were obtained from the Savannah Trust Company for the purpose of having the property therein described "rehandled." Exactly what might be included by the term "rehandle" is not indicated by anything appearing in the contract itself, but in a broad sense the word might include much more than merely remarking or rehandling, or

otherwise putting in better physical shape, the bales of cotton covered by the warehouse receipts. That the purpose of the "pink tickets" was to invest Tinsley & Hull with greater power than merely the right to transfer the cotton or some of it from one warehouse to another, or to have it rebaled or remarked, or to do anything to change the physical appearance or location of the cotton, is indicated by the further recitals in the "pink tickets" that the property described in the warehouse receipts was to be delivered (on sale or shipment) by Tinsley & Hull as agents of the Savannah Trust Company, by one o'clock in the afternoon of the following day, "and the proceeds thereof are to be paid at once to said bank, or if the property is not disposed of as aforesaid and the proceeds paid to said bank within the time named," then and in that event (that is, in case a sale of the property or a conversion of the property into money is not effected by Tinsley & Hull as agents for the bank before one o'clock on the following day) the "receipts are to be returned to said bank within that time"—that is, by one o'clock p. m. on the day after the "pink tickets" were signed. It may be mentioned just here, as disclosed by the record, that the "pink tickets" delivered by Tinsley & Hull to the National Bank of Savannah provided by their terms that the warehouse receipts or their proceeds should be delivered by 6 o'clock p. m. on the 'day of the execution of the same—i. e., by 6 o'clock p.m. on March 4, 1913. It will be observed that the "pink tickets" delivered to the Savannah Trust Company (as well as those delivered to the National Bank of Savannah) clearly recognized that the cotton described in the warehouse receipts was placed in the hands of Tinsley & Hull as agents for the bank, but, as already suggested, when Tinsley & Hull tendered the warehouse receipts received from the Savannah Trust Company to the National Bank of Savannah, so far as the record discloses, there was absolutely nothing whatever to put the National Bank of Savannah on notice that Tinsley & Hull were acting as agents for the Savannah Trust Company, or were dealing with property belonging to that corporation. In other words, the agency for the Savannah Trust Company was concealed, and the National Bank of Savannah, dealing with Tinsley & Hull, would be authorized to set up any defense against the Savannah Trust Company which it could have set up against Tinsley & Hull. Civil Code, § 3604. Clearly Tinsley & Hull could not

themselves recover the 501 bales of cotton delivered to the National Bank of Savannah; and if they could not sustain an action for this cotton, neither could their concealed principal sustain it as against the National Bank of Savannah.

Recurring for a moment to a feature of the case considered above, it is clear to us that by the acceptance of the 560 bales of cotton turned over to the National Bank of Savannah in substitution for Tinsley & Hull, it parted with the indicia of ownership to the property therein described, and when its agents, Tinsley & Hull, in possession by their consent of the said indicia of ownership, conveyed the 560 bales for which Tinsley & Hull had previously given to that bank "pink tickets" or trust receipts, the National Bank of Savannah put it absolutely out of its power to demand from Tinsley & Hull an accounting on the "pink tickets," and relieved Tinsley & Hull from all responsibility thereunder. When the Savannah Trust Company parted with the warehouse receipts delivered to the same in pledge by way of substitution for other securities, and the National Bank of Savannah accepted the warehouse receipts obtained from the Savannah Trust Company by Tinsley & Hull, the pledgee got equally as good title thereto as if there had been an absolute sale for cash by the agents of the Savannah Trust Company to the National Bank of Savannah.

For the purposes of this case, it is immaterial whether Tinsley & Hull conveyed the property to the National Bank of Savannah as security for a pre-existing debt due that bank by them, or whether they sold the property absolutely for cash. It is well settled that an innocent pledgee of a warehouse receipt takes title superior to the lien of a vendor who permits the receipt to pass into the hands of the vendee in such a way as to enable the vendee to pledge it. See, in this connection, Jones on Collateral Securities, § 360.

. The record discloses that on the day following the delivery of the 560 bales of cotton by Tinsley & Hull to the National Bank of Savannah Tinsley & Hull became insolvent, so that (so far as appears from the record) the retention by the National Bank of Savannah of the 501 bales of cotton sued for by the Savannah Trust Company will result in a loss of at least a portion of the debt due by Tinsley & Hull to the Savannah Trust Company, which was thereby secured; but this, so far as appears from the record, is

merely a piece of good fortune on the part of the National Bank of Savannah, and of ill fortune on the part of the Savannah Trust Company, or, in other words, is seemingly chargeable to a business accident or to "the fortunes of war," since there is nothing to indicate any special reason why Tinsley & Hull should have desired to protect the National Bank of Savannah at the expense of the Savannah Trust Company, or vice versa. Tinsley & Hull perhaps desired and intended to replace the cotton received from the two banks, in accordance with the terms of the "pink tickets," and did return the cotton received from the National Bank of Savannah on the afternoon of the same day, because the time for its return, under the terms of the "pink tickets" given that bank, expired at 6 p. m. on that day, whereas they had until 1 p. m. on the following day to return the cotton received from the Savannah Trust Company, or cotton of like grade, and may only have been prevented from doing so by their failure on March 5, before the expiration of the time limit.

The "pink tickets" or receipts signed by Tinsley & Hull before receiving the warehouse receipts for the 501 bales of cotton from the Savannah Trust Company not only recited that Tinsley & Hull desired to "rehandle" this cotton, but expressly recognized Tinsley & Hull as agents for the Savannah Trust Company, and, while declaring that the title to the property was in the Savannah Trust Company, distinctly provided that it was to be delivered on sale or for shipment by one o'clock p. m. of the following day, the proceeds thereof to be paid at once to that bank, "or if said property is not disposed of as aforesaid and the proceeds paid to said bank within the time named, said receipts are to be returned to said bank within that time." It is very clear to us that under the express terms of the "pink tickets," Tinsley & Hull were empowered to dispose of the property as agents for the Savannah Trust Company, and, if they violated the trust reposed in them, and after disposing of the property failed or refused to turn over the proceeds thereof to the principal, this could not invalidate the title of one who, bona fide and in exchange for something of value, obtained the property from them with no knowledge that they were simply agents for the Savannah Trust Company and did not in fact themselves possess the absolute title to the property, and the right to dispose of it without accounting to any one for the proceeds.

As already stated, the National Bank of Savannah, when it accepted the cotton delivered to it on the afternoon of March 4, 1913 (including the 501 bales obtained by Tinsley & Hull from the Savannah Trust Company in substitution for a like number of bales for which the National Bank of Savannah held trust receipts from Tinsley & Hull), unquestionably put it beyond its power to insist thereafter upon the performance of the conditions embodied in the receipts previously given to it by Tinsley & Hull, or to require from Tinsley & Hull a compliance with the terms of those receipts; and this right so parted with was also unquestionably a thing of value, since, notwithstanding the insolvency of Tinsley & Hull, which appeared on the following day, the trust receipts, in effect canceled by the acceptance of the cotton substituted by Tinsley & Hull on the afternoon of March 4 for that received from the National Bank of Savannah in the morning of the same day, would have not only constituted a special claim against the estate of the insolvent debtors, which might be of some financial value, but also gave to the National Bank of Savannah a personal hold on one, if not both, of the members of the firm of Tinsley & Hull, on account of the breach of the trust reposed in that firm, which might have enabled the bank to realize the total indebtedness, or some further portion of the amount due it by Tinsley & Hull.

3. Suffice it to say, this, it appears to us, is conclusive of the issues raised in this case: that the Savannah Trust Company placed it in the power of Tinsley & Hull to sell or pledge or otherwise dispose of the warehouse receipts delivered to them on "pink tickets," and they did in fact dispose of these receipts to the National Bank of Savannah, which received the same bona fide and without notice or knowledge that Tinsley & Hull were handling the property in question merely as agents for the Savannah Trust Company; and since, "when one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury must bear the loss" (Civil Code, § 4537), the loss in this case must fall upon the plaintiff, the Savannah Trust Company, and the court below properly held that under the evidence the only legal verdict that could have been rendered was a verdict in favor of the defendant.     *Judgment affirmed.*